# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE HUMANE SOCIETY      )
OF THE UNITED STATES     )
2100 L Street, NW          )
Washington, DC 20037,     )
                            )   No. _____

WILD FISH CONSERVANCY   )
P.O. Box 402              )
15629 Main Street, NE     )
Duvall, Washington 98019   )
                            )   **Complaint for Declaratory and**

BETHANIE O'DRISCOLL    )   **Injunctive Relief**
324 S 3rd St              )
Saint Helens, OR 97051,    )
                            )

ANDREA KOZIL          )
7517 SW 49th Ave         )
Portland, OR 97219       )
                            )

          Plaintiffs,       )
                            )

       v.                  )
                            )

JOHN BRYSON           )
Secretary of Commerce     )
U.S. Department of Commerce  )
14th Street & Constitution Ave., NW )
Washington, DC 20230,     )
                            )

SAMUEL RAUCH,        )
Assistant Administrator, NOAA Fisheries )
National Marine Fisheries Service  )
1315 East-West Highway    )
Silver Spring, MD 20910,    )
                            )

JAMES LECKY,          )
Director, Office of Protected Resources )
National Marine Fisheries Service  )
1315 East-West Highway    )
Silver Spring, MD 20910,    )
                            )

          Defendants.      )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Sea lions eat fish. Each year, California sea lions eat between 0.4 and 4.2 percent of the 80,000 to 300,000 salmon and steelhead that spawn in the Columbia River. In comparison, fishermen are authorized to take approximately up to 17 percent of adults, hydroelectric dams are allowed take a up to 17 percent of adults, and non-native fish such as bass and walleye (of which hundreds of thousands are  intentionally released  by the government each year), take more than two million juveniles each year. Despite these impacts, recent Chinook salmon returns have been among the highest seen in a decade, and the States of Washington and Oregon have *increased* the amount of take permitted by fishermen over the last few years, allowing fishermen to take up to 12 percent of the total run in 2011, over 10 times the 1.1 percent total consumption by California sea lions that same year.

2.      Despite over a decade of fishery harvests that far exceed the miniscule predation by sea lions, the National Marine Fisheries Service ("NMFS") decided in 2008 that sea lions in the Columbia River must be killed to protect salmon, and authorized state agents to shoot as many as 85 of the docile and federally protected marine mammals each year for 5 years – a total of 425 animals. The agency authorized this killing under Section 120 of the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1389, which provides a limited exception to the MMPA's otherwise strict prohibition on the killing or harassment of any marine mammal, but only for those marine mammals that "are having a *significant negative impact on the decline or recovery*" of threatened or endangered salmon and steelhead populations. *Id.* § 1389(b) (emphasis added).

3.      Shortly after NMFS issued the authorization to kill sea lions at the Bonneville Dam in 2008, Plaintiffs filed a lawsuit challenging this authorization. In November 2010, the

Court of Appeals for the Ninth Circuit vacated NMFS's decision and remanded it to the agency, because the agency failed to reconcile its factual finding that sea lions are having a "significant negative impact" on salmonids with the agency's previous factual findings "that fisheries that cause similar or greater mortality among these populations are not having significant negative impacts." *Humane Soc'y of the U.S. v. Locke,* 626 F.3d 1040, 1048 (9th Cir. 2010). The court noted that NMFS's contradictory factual findings regarding equivalent or greater sources of salmonid mortality "raise questions as to whether the agency is fulfilling its statutory mandates impartially and competently." 626 F.3d at 1049.

4.      Undeterred by this ruling, NMFS scrambled to quickly re-authorize the killing of up to 85 sea lions per year at the Bonneville Dam in almost exactly the same manner, and for the same reasons in the decision vacated by the Ninth Circuit. The agency reissued its decision on May 12, 2011without requiring new applications from the states under Section 120 of the MMPA, without providing any prior public notice of the decision, without providing opportunity for public comment on the decision, and without convening the Pinniped-Fishery Interaction Task Force -- the purpose of which is to advise NMFS on whether to approve Section 120 applications. Plaintiffs challenged the new authorization on May 20, 2011 for violating the procedural and substantive requirements of the MMPA, and NMFS withdrew the authorization on July 26, 2011 citing the litigation.

5.      The States of Oregon, Washington, and Idaho subsequently submitted a new application on August 18, 2011, once again requesting authority to lethally remove individually identifiable California sea lions seen eating salmon at Bonneville Dam. On March 15, 2012, NMFS again granted the states' request, authorizing state agents to kill as many as 92 federally protected California sea lions each year for 5 years – a total of 460 animals.

6.      Plaintiffs now challenge NMFS's finding that the sea lions' annual subsistence taking of 0.4 to 4.2 percent of the total salmon and steelhead run is having a *significant negative impact on the decline or recovery* of listed stocks under the MMPA as arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law under the Administrative Procedure Act, 5 U.S.C. § 706(2). Plaintiffs also challenge NMFS's failure to authorize the unintentional take of federally protected Steller sea lions, as required by the MMPA and Endangered Species Act ("ESA"), that will occur as the result of the lethal removal of California sea lions, as well as NMFS's decision to forego any supplement to its Final Environmental Assessment issued in 2008 despite the fact it is now more than 3.5 years old, and despite new evidence that salmon and steelhead run sizes are consistently growing and not declining, that the number of sea lions at the dam is decreasing, that the rate of sea lion predation is decreasing, that fisheries have exceeded their allocations in recent years, and that there are newly recognized sources of salmon and steelhead mortality.

7,      NMFS's March 2012 decision to authorize the eradication of several hundred native sea lions – while a significant loss of native, federally protected wildlife – is highly unlikely to have any effect on the decline or recovery of listed salmonids, and thus is not only arbitrary and capricious, but *continues* to stand in stark contrast to many past NMFS decisions finding that salmon take far in excess of 4 percent by fishermen, tribes, and other resources users *does not have* a "significant" impact on the same species of salmon. Moreover, in its 2012 decision, NMFS fails to  address the prior ruling of the Court of Appeals for the Ninth Circuit demanding that the agency articulate a rational explanation for reconciling this disparity in its *factual* findings, and has re-written the statutory standard to match its perception of the facts of this particular situation and fit its desired outcome.  As explained by the Ninth Circuit, the

agency's decision "raise[s] questions as to whether the agency is fulfilling its statutory mandates impartially and competently." 626 F.3d at 1049.

8.      Plaintiffs request that the Court vacate the agency's flawed, biased and unlawful decision to authorize lethal removal, and enjoin any killing of sea lions at Bonneville Dam until and unless the agency has fully complied with the requirements of the MMPA, the ESA and NEPA.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States."

10.     Venue in this Court is proper under 28 U.S.C. § 1391(e).

## PARTIES

11.     Plaintiff the Humane Society of the United States ("HSUS") is a non-profit organization headquartered in Washington, DC. The HSUS is the nation's largest animal protection organization, with over 11 million members and constituents, including over 415,000 members and constituents who reside in Oregon, Washington and Idaho. The HSUS is committed to the goals of protecting, conserving, and enhancing the nation's wildlife and wildlands and fostering the humane treatment of all animals. In furtherance of these goals and objectives, the HSUS and its members have demonstrated a strong interest in the preservation, enhancement, and humane treatment of marine mammals, including California sea lions.

12.     The HSUS has been an active participant throughout the agency's proposal to lethally remove sea lions at Bonneville Dam. On behalf of itself and its members, the HSUS commented on the Section 120 applications that resulted in NMFS's March 2008 authorization

to kill sea lions at the Dam and also commented on NMFS's current authorization.  Further, an HSUS employee served as a federally-appointed member of the Pinniped-Fishery Interaction Task Force convened to assist NMFS in its consideration of both those applications.

13.     The HSUS also brings this action on behalf of its members. HSUS members regularly enjoy viewing sea lions both near Bonneville Dam and further down the Columbia River. These members enjoy looking for, sighting, and observing the sea lions, and particularly enjoy observing individual animals that members have learned to recognize based on brands, tags, identifying natural markings, or personalities. These members have an emotional connection to the individual sea lions they have gotten to know, similar to the connection they feel to a family pet. These members plan to continue identifying and returning to observe their favorite individual sea lions at the Bonneville Dam in the future.

14.     Other HSUS members live near Bonneville Dam and regularly enjoy kayaking, hiking, and observing the Columbia River and the sea lions near and just down-river of the Dam. These members plan to continue boating, hiking, and observing the behavior of the sea lions near the Bonneville Dam in the future.

15.     HSUS members' interests in observing, studying, and appreciating these sea lions, particularly the animals that they recognize individually, are injured by NMFS's decision to kill the sea lions at Bonneville Dam – likely some of the very animals the members regularly observe and recognize. If the individuals are killed, these members will no longer be able to observe and recognize their favorite individual animals. Even if the individual animals are not killed, the members will be emotionally affected by worrying about the impending or possible deaths of these animals. These members' enjoyment in observing sea lions will be diminished, particularly

as they look for the individual sea lions they recognize and are concerned that, if the animals are not there, they may have been shot or euthanized.

16.     In addition, members who frequently boat and hike near the Bonneville Dam are concerned that their recreational enjoyment will be diminished by witnessing the killing, blood, or carcasses of sea lions in or near the water. They are also concerned that closures of portions of the river and adjacent recreational areas during the killing will prevent the members from recreating near the Dam. Also, if the agency is successful in reducing the number of sea lions that frequent the dam, these members' ability to sight and observe sea lions will also be limited.

17.     Vacating the agency's decision to kill sea lions at Bonneville Dam will preserve both the lives of the individual animals that HSUS members recognize, and preserve the recreational and emotional enjoyment that HSUS members receive from seeing the individual animals and recreating free from blood, carcasses, and killing.  Further, a remand specific to the procedural violations raised by Plaintiffs would remedy the procedural rights of the HSUS, its staff, and its members to participate in the Section 120 approval process, and would remedy informational harms stemming from NMFS' failure to publish the states' December 2010 requests for killing sea lions at Bonneville Dam, and particularly the states' justifications for such killing in light of the new data provided in support of NMFS' May 2011 decision.

18.     Plaintiff Wild Fish Conservancy ("WFC") is a non-profit organization dedicated to the recovery and conservation of the Northwest region's wild fish ecosystems, with about 2,400 members. Wild Fish Conservancy's staff of over 20 professional scientists, advocates, and educators works to promote technically and socially responsible habitat, hatchery, and harvest management to better sustain the region's wild fish heritage. Specifically, WFC promotes scientifically credible wild fish conservation by advocating for risks to be acknowledged and

addressed, data responded to appropriately, laws obeyed, and conservation responsibilities distributed objectively and equitably. WFC believes that best way to achieve fish conservation is through credible and transparent, science-based agency decision-making. Wild Fish Conservancy's members use and enjoy rivers and streams throughout the Columbia River watershed for recreational, scientific, and aesthetic purposes, deriving benefits from robust salmon and steelhead populations and healthy aquatic and marine habitats.

19.     Wild Fish Conservancy brings this action to challenge NMFS's decision to allow 92 sea lions a year to be killed at Bonneville Dam. WFC believes the agency plan is unlawful and does not represent a valid, scientifically-sound decision based on the data and analyses available. WFC believes that salmon recovery will not be achieved unless NMFS adopts a more rigorous approach to properly account for and address all sources of mortality and all amounts of mortality that are permitted by NMFS under the numerous permitting processes over which the agency has direct control. WFC and its members are concerned that, by making this decision, valuable state and federal resources that could be spent on effective fish conservation programs are being wasted on an unlawful and irrational sea lion removal project. WFC and its members are concerned that projects like NMFS's plan to kill sea lions at Bonneville Dam will delay and hamper efforts to address the significant threats facing wild fish in the Columbia River Basin and will hasten the decline of these species.

20.     Vacating the agency's decision to kill sea lions at Bonneville Dam will stop an unlawful and irrational project from proceeding, and save valuable funding that can be used on beneficial conservation projects that Wild Fish Conservancy advocates for, and that can be used to help stabilize and recover the wild fish populations Wild Fish Conservancy's members enjoy.

21.     Plaintiff Bethanie O'Driscoll resides in St. Helens, Oregon on property that overlooks the Columbia River. In the spring, in addition to viewing sea lions from her house, Ms. O'Driscoll also sees sea lions when she goes out on the Columbia River to kayak and sail several times each week. She also frequently visits Astoria, Oregon, where many sea lions haul out during the spring, to photograph and try to recognize her favorite animals. For the past 14 years she has lived in St. Helens, Ms. O'Driscoll has learned to recognize certain individual sea lions by their brands, markings, or personalities. For example, Ms. O'Driscoll has learned to recognize two sea lions she calls "Smile" and "Solo."  Smile often comes up to her kayak, swims around, and follows her on the water. Although Smile does not have a brand, she can recognize him by his markings, the large number of whiskers he has, and by his particular personality. Solo sat in one spot for days, refusing to move, after the Oregon Department of Fish and Wildlife trapped and killed his companion. She has also learned to recognize C552, C555, C404, and other sea lions each of whom has his own individual personality. C404 has already been added to the list of animals authorized to be killed under the lethal removal program. Ms. O'Driscoll has developed a personal relationship with some of these animals, in the same way people develop a relationship with a family pet. Ms. O'Driscoll intends to continue boating, observing, and photographing sea lions in the future.

22.     Ms. O'Driscoll is a member of the HSUS, and is aware of NMFS's decision to kill up to 92 sea lions per year at the Bonneville Dam. Some of the same sea lions that Ms. O'Driscoll has gotten to know have been documented to visit the Dam. Ms. O'Driscoll will be severely emotionally affected if she learns that any of her favorite sea lions – with whom she maintains a relationship with like that of a pet – have been killed.  Further, her enjoyment of boating, observing, and photographing sea lions will be greatly diminished if she tries to look for

her favorite animals, and if she does not see them, fearing they may have been killed at Bonneville.

23.     Vacating the agency's decision to kill sea lions at Bonneville Dam will preserve both the lives of the individual animals that Ms. O'Driscoll has a relationship with and retain the recreational and emotional enjoyment she receives from observing and recognizing those individuals.

24.     Plaintiff Andrea Kozil resides in Portland, Oregon, and is a frequent observer of sea lions up and down the Columbia River. She frequently visits Astoria and Sauvie Island to watch the animals, and she usually stops to try to observe sea lions on each of her frequent trips up the Gorge near Bonneville Dam. Ms. Kozil particularly enjoys trying to recognize some of her favorite animals when they are hauled out. She usually looks for a particular animal who has unique markings – a double light-brown circle on his head. She also enjoys looking for other individuals she has learned by brand or tags, like C598 and C771, whom she has enjoyed watching interact with one another, C795, C070 and C016.  C795 and C016 have already been added to the list of animals authorized to be killed under the lethal removal program – in fact, C016 was added the same day that NMFS's March 2012 authorization was issued. Ms. Kozil plans to continue observing sea lions in the future, just as she has done in the past.

25.     Ms. Kozil is a member of the HSUS, and is aware of NMFS's decision to kill up to 92 sea lions per year at the Bonneville Dam. Ms. Kozil is concerned that some of the animals she has learned to recognize may be killed as part of NMFS's plan, and the special connection she feels with some of the animals will be broken. Her enjoyment in watching the animals will be been diminished as she tries to look for animals she recognizes and worries she is unable to see them because they have been killed at Bonneville Dam.

26.     Vacating the agency's decision to kill sea lions at Bonneville Dam will preserve both the lives of the individual animals with whom Ms. Kozil has a relationship with and retain the recreational and emotional enjoyment she receives from observing and recognizing those individuals.

27.     Defendant John Bryson is the Secretary of Commerce and has ultimate responsibility for the programs of NMFS. Secretary Bryson is sued in his official capacity.

28.     Defendant Sam Rauch is the Assistant Administrator for NMFS, the agency within the Department of Commerce that has been delegated the responsibility for implementing the MMPA. Mr. Rauch is sued in his official capacity.

29.     Defendant James Lecky is the Director of the Office of Protected Resources at NMFS. Mr. Lecky signed the Letters of Authorization at issue in this case. Mr. Lecky is sued in his official capacity.

30.     Collectively, Defendants named in Paragraphs 27 through 29 above shall be referred to as "Defendants" or "NMFS" in this Complaint.

## STATUTORY BACKGROUND

### A.    The Marine Mammal Protection Act

31.     The Marine Mammal Protection Act ("MMPA" or "Act") represents Congress' most expansive explication of the nation's commitment to the "protection and conservation" of sea lions and other marine mammals. 16 U.S.C. § 1361(5). Its primary purpose is to remedy "man's . . . malign neglect and virtual genocide" of marine mammals, and to promote "solicitous and decent treatment" of "polar bears, manatees and other [animals that] have been shot, blown up, clubbed to death, run down by boats, poisoned, and exposed to a multitude of other

indignities, all in the interest of profit or recreation." H.R. Rep. No. 92-707, 92nd Cong., 2nd Sess. 1 (1971).

32.     To fulfill this purpose, the MMPA establishes a strict moratorium on the taking and importation of all marine mammals and marine mammal products. 16 U.S.C. § 1371(a). The Act defines "take" as "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id.* § 1362(13). "Harassment" is defined as "any act of pursuit, torment, or annoyance which (i) has the potential to injure a marine mammal or marine mammal stock in the wild; or (ii) has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering." *Id.* § 1362(18)(A).

33.     In 1994, Congress enacted a limited exemption to the prohibition on taking marine mammals. Section 120 of the MMPA authorizes the Secretary of Commerce, upon the filing of an application by a state, to "permit the intentional taking of individually identifiable pinnipeds" – a grouping of marine mammals that includes, sea lions, fur seals, and true seals – if the Secretary determines that the pinnipeds are having a "significant negative impact on the decline or recovery" of salmon stocks listed as endangered or threatened. 16 U.S.C. § 1389(b).

34.     Consistent with the MMPA's narrow limitation on the take of marine mammals, Section 120 establishes a specific procedure that must be followed, and sets out a series of determinations the Secretary must make, before permitting the take of pinnipeds.

35.     Upon receiving a Section 120 application from a state, NMFS must determine whether the application contains "sufficient evidence" to warrant convening a Pinniped-Fishery Interaction Task Force. 16 U.S.C. § 1389(c)(1). Specifically, the Secretary must consider whether the application "include[s] a means of *identifying individual pinniped* or pinnipeds, and . . .

include[s] a detailed description of the problem interaction and *expected benefits of taking*." *Id.* § 1389(b)(2) (emphases added).

36.     If warranted, NMFS must publish a Federal Register notice requesting comments on the application, *id.* § 1389(c)(1), and must also convene a Pinniped-Fishery Interaction Task Force. The Task Force is assigned to "recommend to the Secretary whether to approve or deny the proposed intentional lethal taking of the pinniped or pinnipeds," and provide "a description of the specific pinniped individual or individuals, the proposed location, time, and method of taking, criteria for evaluating the success of the action, and the duration of the intentional taking authority." *Id.* § 1389(c)(3). The Task Force must also "suggest nonlethal alternatives." *Id.*

37.     The MMPA provides that the Secretary must decide whether to approve or deny the application only after receipt and consideration of the Task Force's recommendations. The MMPA also provides very specific findings the agency must make before lethal action may be authorized.  First, the Secretary may *only* authorize the lethal taking of "individually identifiable pinnipeds which are having a *significant negative impact* on the decline or recovery of salmonid fishery stocks which . . . have been listed as threatened species or endangered species" under the Endangered Species Act ("ESA"). *Id.* § 1389(b)(1)(A) (emphasis added). Also, the Secretary "shall consider: (1) population trends, feeding habits, the location of the pinniped interaction, how and when the interaction occurs, and how many individual pinnipeds are involved; (2) past efforts to nonlethally deter such pinnipeds, and *whether the applicant has demonstrated that no feasible and prudent alternatives exist and that the applicant has taken all reasonable nonlethal steps without success*; (3) the extent to which such pinnipeds are causing undue injury or impact to, or imbalance with, other species in the ecosystem, including fish populations; and (4) the

extent to which such pinnipeds are exhibiting behavior that presents an ongoing threat to public safety." *Id*. § 1389(d)(1)–(4) (emphasis added).

38.     Congress clearly intended that NMFS fully consider all other factors impeding recovery prior to determining whether to approve a request to kill sea lions. Indeed, upon enacting Section 120 of the MMPA, Congress explicitly "recognize[d] that a variety of factors may be contributing to the declines of these stocks," and made clear to the agency that "the current levels of protection afforded to seals and sea lions under the Act should not be lifted *without first giving careful consideration to other reasons for the decline*."  H.R. REP. NO. 103-439 (1994) (emphasis added).

39.     If, after considering the Task Force's recommendation, NMFS approves the application, lethal take may occur.

40.     The MMPA also strongly emphasizes the humane treatment of marine mammals. Defining "humane," the Act states: "in the context the taking of a marine mammal . . . that method of taking which involves the least possible degree of pain and suffering practicable to the mammal involved." 16 U.S.C. § 1362(4); *see also id*. § 1374(b)(2)(B) (in order to issue take permits, Secretary "shall . . . specify . . . the location and manner (which must be determined by the Secretary to be humane) in which they may be taken"); *id.* § 1379(h) (authorizes states, federal agencies, and local governments to take marine mammals for the protection of the mammal or public health "in a humane manner (including euthanasia)").

41.     Congress consistently expressed its intent that the lethal removal of pinnipeds under Section 120 be done in a humane manner. *See* S. Rep. 103-220, at 18 (1994) (the "new section . . . of the MMPA [will] govern the lethal and *humane* removal of identifiable nuisance

pinnipeds") (emphasis added); 140 Cong. Rec. S3288, S3296 (1994) (statement of Senator

Kerry) (same).

42.     In addition, with respect to the *unintentional* take of marine mammals, NMFS can

authorize the incidental take of "small numbers" of marine mammals by those engaged in "a

specified activity . . . within a specified geographical area." 16 U.S.C. § 1371(a)(5). This

provision of the MMPA allows NMFS to authorize the incidental taking for up to five years

provided it first finds, after notice and comment, that the incidental take will have a "negligible

impact" on the species or stock to be taken, and promulgates regulations establishing the

permissible methods of taking to effect "the least practicable adverse impact" on the species. *Id.*

§ 1371(5)(A)(i)(I)-(II).

**B.     The Endangered Species Act**

43.     Once listed under the ESA, a species is entitled to a number of protections,

including both prohibitions on harm and affirmative duties to promote the species' conservation

and recovery. Specifically, Section 9 of the ESA prohibits any person from "taking" an

endangered species, with limited exceptions. *Id.* § 1538(a)(1)-(2). This prohibition can be

extended to threatened species by rule. *Id.* §§ 1533(d), 1538(a)(1)(G). A "person" includes

private parties as well as local, state, and federal agencies. 16 U.S.C. § 1532(13). "Take" is

defined broadly under the ESA to include harming, harassing, trapping, capturing, wounding, or

killing a protected species either directly or by degrading its habitat sufficiently to impair

essential behavior patterns. *Id.* § 1532(19). The ESA prohibits the acts of parties directly causing

a take as well as the acts of third parties, such as governmental agencies, whose acts authorize or

otherwise bring about the taking. *Id.* § 1538(g).

44.     In addition, Section 7(a)(2) of the ESA requires federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or result in the destruction or adverse modification of [critical] habitat." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

45.     To comply with Section 7(a)(2)'s substantive mandate, federal agencies must consult with NMFS or the United States Fish and Wildlife Service whenever their actions "may affect" a listed species and utilize the "best scientific and commercial data available" in doing so. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

46.     Where, as here, NMFS is both the action agency and the consulting agency, different branches of NMFS must undertake intra-agency consultation under Section 7(a)(2). The result of this consultation is the preparation of a "biological opinion" that describes the expected impact of the authorization of the removals of predatory sea lions at Bonneville Dam. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14.

47.     If the consulting agency concludes that the proposed action is not likely to jeopardize a listed species but nevertheless will result in take of that species, the consulting agency must provide the action agency with an "incidental take statement." 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(1). The incidental take statement ("ITS") must: (1) specify the amount or extent of the incidental taking on the species, (2) specify the "reasonable and prudent measures" that the consulting agency considers necessary or appropriate to minimize such impact, (3) set forth the "terms and conditions" that must be complied with by the action agency to implement the reasonable and prudent measures (including, but not limited to, reporting requirements); and (4) specify the procedures to be used to handle or dispose of any individual animals actually taken. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

48.     The incidental take of a listed species is unlawful unless it is permitted by, and conducted in compliance with the terms of, an ITS. 16 U.S.C. §§ 1536(b)(4) and (o)(2); 50 C.F.R. § 402.14(i)(5).

**C.     The National Environmental Policy Act**

49.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1. The critical purposes of the statute include "insur[ing] that environmental information is available to public officials and citizens before decisions are made and actions are taken," and "help[ing] public officials make decisions that are based on understanding of environmental consequences." *Id.* § 1500.1(b)-(c). "Public scrutiny [is] essential to implementing NEPA." *Id.*

50.     To accomplish these purposes, NEPA requires all agencies of the federal government to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This statement is known as an Environmental Impact Statement ("EIS").

51.     The EIS must detail, among other things, "the environmental impact of the proposed action" and "alternatives to the proposed action." *Id.* NEPA further requires that agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *Id.* § 4332(2)(E).

52.     NEPA's implementing regulations elaborate on these statutory requirements. The regulations provide that agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). The regulations further provide that "[a]gencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements." *Id.* § 1502.24.

53.     NEPA requires that when an agency proposes to undertake an "action," the agency "must first determine whether the action is one that normally requires" the preparation of an EIS pursuant to NEPA and its implementing regulations. 40 C.F.R. § 1501.4(a).

54.     If the agency is not certain whether an EIS is required, it must prepare an Environmental Assessment ("EA") to determine whether an EIS is necessary. *Id*. § 1501.4. The EA must discuss the need for the proposal, evaluate alternatives that would cause less adverse environmental impacts, and provide sufficient evidence and analysis to support the agency's determination as to whether the proposed action will significantly affect the environment. *Id.*

55.     In the EA, the agency must consider a number of factors to determine whether an action has a "significant" effect on the environment to trigger preparation of an EIS. These factors include: (1) "[i]mpacts that may be both beneficial and adverse," even if the action on the whole is beneficial, (2) "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," (3) "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," (4) "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment," and (5) "[t]he degree to which the action may adversely affect an endangered or threatened species." *Id*. § 1508.27(b)

56.     NEPA requires agencies to take a "hard look" at the environmental effects of their planned action, even after a proposal has received initial approval.  Agencies are required to prepare a supplemental EIS if  "(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its

impacts." 40 C.F.R. 1502.9(c). An agency's determination of whether to supplement an EIS or

EA is subject to judicial review under the APA's "arbitrary and capricious" standard.

57.     Neither the NEPA statute nor the Council on Environmental Quality's

implementing regulations envision the issuance of Supplemental Information Reports ("SIR").

Agencies are required to supplement an EA or EIS when the statutory and regulatory thresholds

are triggered; a SIR is not an appropriate substitute for a supplemental EA or EIS. Similarly, an

SIR cannot be used to cure deficiencies in an original EA or EIS.

**C.      The Administrative Procedure Act**

58.     The Administrative Procedure Act provides that "[a] person suffering legal wrong

because of agency action, or adversely affected or aggrieved by agency action within the

meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. "Agency

action made reviewable by statute and final agency action for which there is no other adequate

remedy in a court are subject to judicial review." 5 U.S.C. § 704.

59.     In applying the APA to a final agency action, a reviewing court shall "hold

unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

**FACTUAL BACKGROUND**

**A.      Listed Salmonids in the Columbia River Basin**

60.     The Columbia River, which marks part of the border between Oregon and

Washington State, runs from British Columbia to the Pacific Ocean. Its largest tributary, the

Snake River, runs through Idaho until its confluence with the Columbia River near Richland,

Washington.

61.    "Salmonids" refer to the family *salmonidae*, which includes several species of salmon, as well as steelhead (also called rainbow) trout. Salmonids are anadromous fish, meaning they migrate up rivers from the ocean to breed in fresh water.

62.    Due to numerous threats and declining populations, in 1992, NMFS began listing certain salmonids as threatened or endangered under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544.

63.    Instead of listing the whole species, NMFS has instead listed "distinct population segments" ("DPSs"), or subsets, of salmonid species. 16 U.S.C. §§ 1533(a)(1); 1532(16). NMFS considers a stock of salmon to be a DPS if it "represents an evolutionarily significant unit" of the species. 58 Fed. Reg. 58,612, 58,618 (Nov. 20, 1991); 61 Fed. Reg. 4722, 4722 (Feb. 7, 1996).

64.    NMFS has listed thirteen evolutionarily significant units ("ESUs") of salmonids in the Columbia River basin as threatened or endangered. Final Environmental Assessment on Reducing the Impact on At-risk Salmon and Steelhead by California Sea Lions in the Area Downstream of Bonneville Dam on the Columbia River (2008) ("Final EA") 3-16. These ESUs are typically distinguished by their run – the seasonal timing when a stock leaves the ocean and migrates upriver to breed.

65.    Five of the thirteen listed Columbia River ESUs are implicated in this case due to the overlap between the timing of their run and the presence of California sea lions at Bonneville Dam. Final EA 3-19; NMFS, Report on Consideration of Factors under Section 120 of the MMPA (March 2, 2012) at 4 ("Decision Memo"). These ESUs include all naturally spawned and certain artificially propagated fish of the following runs: Upper Columbia River Spring-run Chinook (endangered), Snake River Spring/Summer-run Chinook (threatened), Snake River Basin Steelhead (threatened), Middle Columbia River Steelhead (threatened), and Lower

Columbia River Steelhead (threatened). *Id.*; 70 Fed. Reg. 37,160 (June 28, 2005) (listing rule); 50 C.F.R. § 223.102(a) (listing threatened salmonid ESUs); 50 C.F.R. § 224.101(a) (listing endangered salmonid ESUs).

66.     Although salmonid populations in the Columbia River have long been in decline and continue to face a multitude of threats, returns of these salmonid runs have increased *nearly every year* since the state's December 2006 applications to kill sea lions at the Bonneville Dam, increasing by more than 250 percent from 2007 to 2011. Decision Memo at 6-7. The five-year status review recently completed by NMFS on all of the ESA-listed salmonid stocks on the west coast indicates that overall, the abundance of Chinook and steelhead stocks that are potentially impacted by predation at Bonneville Dam is stable or increasing. Supplemental Information Report to the 2008 Final EA (2012) ("SIR") at 20. The salmonid runs at the Dam in 2010 and 2011 were the largest since sea lion presence at the Dam was first recorded in 2002. Decision Memo at 6-7; *see also* Stansell et al., 2011 Field Report, Evaluation of Pinniped Predation on Adult Salmonids and other Fish in the Bonneville Dam Tailrace, 2011 at 6 ("Stansell 2011 Report").

67.     In fact, the 2011 upriver spring Chinook return to the Columbia River mouth totaled 221,200 adults—the sixth highest since at least 1980. Joint 2012 Staff Report: Stock Status and Fisheries for Spring Chinook, Summer Chinook, Sockeye, Steelhead, and Other Species (2012) ("Joint 2012 Staff Report") at 15. The 2012 forecast for the upriver spring Chinook is 314,200 adults, which would represent the fourth highest return since 1980, and 156% of the average return observed over the past decade. *Id.* at 15.

68.     Hydropower development has dramatically affected the status of salmonids. Numerous dams lie along the Columbia River and its tributaries. For example, endangered Upper

Columbia Spring-run Chinook breeding north of the Wenatchee River must navigate over seven

dams. *See* Upper Columbia River Spring Chinook Salmon and Steelhead Recovery Plan (2007)

at 90. NMFS estimates that 4 percent of adult salmon and steelhead can be lost *at each dam. Id.*

69.     In addition to direct mortality, dams also indirectly kill salmonids by blocking

access to spawning and rearing habitat and altering riparian habitat, temperature, flood events

and thus nutrient input.

70.     The 2008 Final EA provides estimates for the base mortality resulting from the

dams in the Federal Columbia River Power System for each ESU: (1) 9.9 percent of adult Upper

Columbia River Spring-run Chinook taken in dams and 35.4 percent of juveniles, (2) 15.4

percent of adult Snake River Spring/Summer-run Chinook and 51.5 percent of juveniles, (3) 16.8

percent of adult Snake River Basin Steelhead and 59.9 percent of juveniles, (4) 7.1 percent of

adult Middle Columbia River Steelhead and 2.3 percent of juveniles, and (5) 7.1 percent of

Lower Columbia River Steelhead and 2.3 percent of juveniles. Final EA 3-32. NMFS issued a

new Biological Opinion for the Federal Columbia River Power System in 2008 ("2008 Dam

BiOp"), which the SIR notes was supplemented in 2010, but the SIR does not provide any new

findings in terms of the number of adult and juvenile salmon and steelhead taken by dams. SIR at

21. Last year, a federal court in Oregon found that the 2010 supplemental BiOp was insufficient

to ensure the survival of salmon and steelhead.

71.     As part of its 2007 Federal Columbia River Power System and Upper Snake River

Biological Opinion, NMFS specifically acknowledges and authorizes such levels of take – *i.e.*,

*upwards of 17 percent of adults and 60 percent of juveniles* – as not jeopardizing the various

salmonid ESUs. This finding is reiterated in the 2008 Dam BiOp (finding no jeopardy to lower

Columbia basin salmon and steelhead at current levels of take with Reasonable and Prudent Alternatives in place). 2008 Dam BiOp at 4-11.

72.     Fisheries are another major source of salmonid mortality. Intentional taking of a threatened or endangered salmonid, whether naturally-spawned or hatchery-raised, is prohibited under Section 9 of the ESA. 16 U.S.C § 1538(a)(1)(B). However, NMFS has exempted certain hatchery-spawned fish that are listed as threatened from that prohibition. 50 C.F.R. § 223.203(a). Despite specific limitations on which hatchery-spawned fish may be taken, the incidental take of non-exempt threatened and endangered salmonids still regularly occurs.

73.     NMFS estimates that 10 percent of listed fish caught and released during recreational fishing die, and in terms of commercial fishing activities, 1 percent of fish die after being caught in a dip net, 18.5 percent from selective tanglenet, and 30 percent from selective gillnet fisheries. *See* Biological Opinion on Impacts of Treaty Indian and Non-Indian Fisheries in the Columbia River Basin in Years 2005-2007, on Salmon and Steelhead Listed under the Endangered Species Act, Conference on Lower Columbia Coho, and Magnusson-Stevens Act Essential Fish Habitat Consultation (2005), at 87 ("2005 Fisheries BiOp").

74.     NMFS regulates the number of incidental takes allowed from in-river sport and commercial fishing by tribal and non-tribal entities. NMFS's 2005 Fisheries BiOp described the level of take allowed by the mainstem Columbia fisheries. The harvest rate schedules described therein were subsequently adopted into NMFS's 2008-2017 *U.S. v. Oregon* Management Agreement for Upriver Chinook, Sockeye, Coho, and White Sturgeon (2008) ("2008 Fisheries BiOp"). SIR at 25. Pursuant to these harvest schedules NMFS currently allows *up 17 percent* of the natural origin Upper Columbia River Spring-run Chinook and Snake River Spring/Summer-run Chinook salmon runs to be taken, depending on the total run size. *Id.*; Final EA 3-32.

According to the Final EA, NMFS also allows up to 6 percent of both the Middle Columbia River and Lower Columbia River Steelhead natural-origin runs to be incidentally taken. Final EA 3-32.

75.     In its Biological Opinions concerning fisheries impacts on listed salmonids, NMFS determined that currently authorized levels of take – *i.e.*, from 5.5 to 17 percent – would not jeopardize the various ESUs. *See* 2005 Fisheries BiOp at 118; 2008 Fisheries BiOp at 42. Further, NMFS also issued a "finding of no significant impact" with respect to these harvest schedules after making the factual finding that the cumulative impacts from the authorization of take by fisheries of up to 17 percent "would be minor if at all measurable."  Environmental Assessment on the Biological Opinion and Associated Incidental Take Statement on Treaty Indian and Non-Indian Fisheries in the Columbia River Basin in the Years 2005-2007 (2005) at 69, 79 ("2005 Fisheries Take EA").

76.     For the 2008 season, the same season that NMFS first authorized the killing of sea lions at Bonneville Dam under Section 120 of the MMPA, the states of Oregon and Washington *increased* the amount of upriver spring Chinook allowed to be incidentally taken by tribal and non-tribal fisheries from 9 percent to 12 percent of the runs.  *See* Joint 2008 Staff Report: Stock Status and Fisheries for Spring Chinook, Summer Chinook, Sockeye, Steelhead, and Other Species (2008) ("Joint 2008 Staff Report") at 41.  Put another way, the states *increased* the number of salmon that fishermen could take by *more than* the take of all sea lions at Bonneville Dam combined (NMFS estimates that sea lions caught 2.9 percent of the salmonid runs in 2008). *See* Decision Memo at 6-7. Even though the states subsequently reduced the allowable harvest rate to 11 percent during the 2008 season, the actual fishery harvest by the end of the season was

estimated to total 16 percent. *Id* at 16. Thus, despite fishery managers' attempts to control fishery harvest, fishermen took 4 percent more of the run than they were allocated.

77.     Fisheries also exceeded harvest limits in 2010. The allowable season harvest rate for upriver spring Chinook was set at 13 percent by fishery managers, but.despite fishery managers' implementation of control measures during the season, including protective impact buffers and catch sharing principles, fishermen actually took 17 percent of the spring Chinook salmon run. SIR at 26. For the 2011 season – the same year in which the states submitted a new lethal removal application –  the states of Oregon and Washington once again *increased* the amount of upriver spring Chinook allowed to be incidentally taken by tribal and non-tribal fisheries from 11 percent to 12 percent - over 10 times the 1.1 percent total consumption by California sea lions that same year. *Id.* Thus, in recent years, fishery harvest has been permitted to increase and has proven to be difficult to control.

78.     Hatcheries are also harmful to wild-run salmon and steelhead populations. In addition to consuming and competing with wild-run fish, hatchery fish may transmit hatchery-borne disease, and interbreeding can affect genetic variability. 2005 Fisheries BiOp at 78. NMFS has noted that hatcheries are one of the main factors delaying salmonid recovery, explaining that hatchery fish may "affect diversity and productivity of naturally produced stocks," and also "ecological effects that reduce the abundance and productivity of populations," including "altered body size and survival of naturally produced fish." *Id.* at 89.

79.     In 2009, a Congressionally-established Scientific Review Group ("HSRG") submitted a report to Congress with recommendations for the reform of harvest and hatchery practices in the Columbia River system. The HSRG found that the current operation of hatcheries required modification to, among other things, minimize adverse ecological

interactions between hatchery- and natural-origin fish such as competition for feeding and spawning locations, predation of hatchery fish upon natural-origin fish, and potential disease transfer. Columbia River Basin Hatchery Reform Group Summary Report at 10. In its full report recommending changes to practices of harvest and hatchery operation, the HSRG found that ". . . the traditional practice of replacing natural populations with hatchery fish to mitigate for habitat loss and mortality due to hydroelectric dams is not consistent with today's conservation principles and scientific knowledge." Report to Congress on Columbia River Basin Hatchery Reform at 7-8. These recommendations have not been implemented despite the HSRG's call for prioritizing them in the recovery strategy.

80.     Predation presents another source of salmonid mortality. Predation by birds, such as great blue herons, gulls, and osprey can also impact populations. 2007 Upper Columbia Recovery Plan at 94. For example, NMFS estimates that avian predators consumed 18 percent of smolts, or juvenile salmonids, reaching the Columbia River estuary in 1998. *Id.* Mammals, including sea lions, raccoons, river otters, mink, black bears, and harbor seals, also consume salmonids. *Id.* Other fish, including adult salmonids, northern pikeminnow, walleye, and smallmouth bass, consume juvenile salmonids. *Id*.

81.     In its SIR, NMFS briefly notes that new studies indicate that predation by non-indigenous fish on juvenile salmonids "could equal or exceed impacts" from each of the four primary factors impacting salmonid recovery: hydrosystem development, fisheries harvest, hatchery practices, and habitat alteration. SIR at 22. In fact, a report prepared by NMFS's own scientists, found that non- indigenous walleye alone consume up to 2 million juvenile salmon in the Columbia *each year*. Sanderson, B., K. Barnas and M. Rub. 2009. Nonindigenous Species of the Pacific Northwest: An Overlooked Risk to Endangered Salmon? BioScience. March 2009 /

Vol. 59 No. 3. Pp. 245-256 ("Sanderson Study"). This non-native species is *introduced* to the river solely to enhance sport fishing opportunities as are other non-indigenous fish. The Sanderson Report "suggest[s] that managing nonindigenous species may be imperative for salmon recovery." *Id.* Despite this imperative, the states' most recent Section 120 application merely states that "there is a commitment to study and develop plans concerning predation of salmon by non-indigenous fish populations" at some point in the future. Oregon, Washington, and Idaho, Request for Marine Mammal Protection Act Section 120 Authorization to Remove California Sea Lions from the Columbia River at 12 (Aug. 18, 2011). NMFS does not address the issue of predation by non-native fish in its Decision Memo at all, and though the agency mentions the 2009 Sanderson Report in its SIR, it does not discuss any of the actual studies reviewed in the report, and simply refers back to the 2008 Final EA (before the report was published) with respect to impacts of predation by non-native fish, though the 2008 Final EA confines discussion of impacts from non-native fish to predation by northern pikeminnow.  Even more alarmingly, far from trying to reduce this source of mortality, in the years considered by the report, the government spent half a million dollars to maintain or *enhance* populations of non-native fish predators that are consuming salmon in the Columbia. Sanderson Study at 254.

**B.      California Sea Lions in the Columbia River Basin**

82.      California sea lions (*Zalophus californianus californianus*) are large marine mammals with a range from southern Mexico to southeast Alaska. Final EA 3-3. Known for their dog-like features, male California sea lions can grow to 1000 pounds and 8 feet long. Females can grow to 6 feet long, but typically only reach 300 pounds.

83.      Breeding for California sea lions typically occurs on or near the Channel Islands, off the coast of southern California. Females are rarely observed north of the California-Oregon

border, but males migrate further north after breeding. *Id*. Male sea lions reach the mouth of the Columbia River in early February.

84.      Official counts of California sea lions at Bonneville Dam began in 2002. NMFS estimates that around 30 sea lions were present in 2002; the number jumped to 106 in 2003 and then decreased annually to 71 sea lions in 2007. Decision Memo at 5. Since 2007, the number of California sea lions at the Dam has varied, with over 80 sea lions present in 2008 and 2010 (though these numbers were still lower than the numbers present in 2003 and 2004), but only 54 sea lions present in 2009 and 2011 (the lowest number since counts began in 2002). *Id*.

85.      The sea lions typically arrive at the Dam in mid-February and leave the Columbia River to return to breeding grounds by late May. Final EA 3-7. However, the mean residency time for individual sea lions observed at the Dam has been declining since 2008, from 20 days in 2008 to 7.3 days in 2011.Decision Memo at 5.

86.      The most recent status report from Bonneville Dam indicates that the number of individual California sea lions seen so far this year is dramatically less than were present at the same time in years passed, and has decreased each year since 2009:

| Report | 1/1/2009-3/13/2009 | 1/1/2010-3/5/2010 | 1/1/2011-3/11/2011 | 1/1/2012 – 3/7/2012 |
|---|---|---|---|---|
| Max on a day | 15 | 12 | 2 | 1 |
| No. different individual animals | 21 | 13 | 5 | 2 |

Stansell, et al, Status Report- Pinniped Predation and Deterrent Activities at Bonneville Dam (March 9, 2012).

87.      California sea lions consume a number of different types of fish in the Columbia River, including salmonids. They also consume other fish species that prey on salmonids. NMFS's 2008 Final EA indicated that observed salmonid consumption by sea lions at the

Bonneville Dam varies, depending on run size, ranging from 0.4 percent of the run in 2002, to 3.4 percent in 2005, down to 2.8 percent in 2006, and up to 4.2 percent in 2007. Final EA 3-13; 1-5. However, the rate of California sea lion predation has *decreased every year* since NMFS's 2008 authorization to kill sea lions at the Dam for reasons that have little to do with the lethal removal program. In 2008, the rate was 2.8 percent of the run, and the rate decreased to 2.1 percent in 2009, 1.9 percent in 2010, and 1.1 percent in 2011, the third-lowest on record since counting began in 2002, Decision Memo at 7, despite the fact that lethal removals were prohibited due to vacatur of NMFS's Section 120 authorization by the Ninth Circuit. In fact, the 2011 predation rate is believed to be close to "the historical rate of predation" at the dam. *See* Decision Memo at 34. Such level of take is dramatically less than that of fishery harvest.

| Year | Total Salmonid Passage at Dam | Allowable Harvest Level | Actual Harvest Level | Predation by California Sea Lions |
|---|---|---|---|---|
| 2008 | 147,534 | 12% (later reduced to 11%) | 16% | 2.83% |
| 2009 | 186,060 | 13% (later reduced to 11%) | 10.5% | 2.12% |
| 2010 | 267,184 | 13% | 17% | 1.87% |
| 2011 | 223,380 | 11% (later increased to 12%) | 10% | 1.1% |

88.     NMFS's 2008 Fisheries BiOp states that the agency believes that the Section 120 lethal removal program can be anticipated to reduce sea lion predation rates to, at best, 3.0 percent for spring Chinook salmon runs. 2008 Fisheries BiOp at 8-16. Yet, in four of the six years preceding authorization of lethal removal activities, sea lion predation rates were below 3.0 percent; and every year since authorization of lethal removal activities (including 2008), sea lion

predation rates have been below 3.0 percent. Decision Memo at 6–7. In fact, last year – a year in which lethal removals were prohibited – both the actual number of salmonids consumed by California sea lions and the rate of predation were the lowest they have been since 2003 – California sea lions consumed only 2,527 fish and 1.1 percent of the total run. *Id.*

89.     Moreover, NMFS's 2008 Final EA indicates that the constant interchange of new animals will always confound any attempt to reduce their presence at the Dam. The EA notes that "eventually new sea lions would likely take the place of sea lions that had been removed" and concluded that the possible benefits "*are too uncertain, however, to support a reliable estimate of any decrease in pinniped predation* (and corresponding increase in salmonids survival)." Final EA at 4-11 (emphasis added). The 2011 Stansell Report supports these contentions, noting that "[t]he increase in CSL abundance at Bonneville Dam in 2010, many which were not seen at the dam before, could be the result of [a] large group of young males exploring new areas, such as the Columbia River, to prey on fish." Stansell Report at 14.

**C.     Steller Sea Lions in the Columbia River Basin**

90.     The eastern stock of Steller sea lions (*Eumetopias jubatus*) is listed as threatened under the Endangered Species Act. *See* 50 C.F.R. § 223.202. They are year-round residents of coastal Oregon and Washington; however, after the breeding season, male Steller sea lions are rarely seen along the Oregon coast. They disperse into more northern feeding grounds in Washington, Canada and Alaska. They venture at times into the Columbia River, where their distribution overlaps that of California sea lions. Both species have been observed feeding on salmon below Bonneville Dam. Final EA at 3-4–3-5.

91.     The number of Steller sea lions observed at the Bonneville Dam has steadily increased, especially in recent years, from 0 in 2002 to 89 in 2011. Decision Memo at 5.

92.     As a result of the increase in Steller sea lion presence at the Bonneville Dam, the percentage of the overall pinniped predation rate attributable to Steller sea lions (as compared to take by California sea lions) has grown. Decision Memo at 7. In 2011, Steller sea lions accounted for 29 percent of pinniped predation. *Id*. However, the overall rate of predation by all pinnipeds still decreased even during the years that Steller sea lion presence has been increasing – in 2008, the overall pinniped predation rate was 3.0 percent of the run, and the rate decreased to 2.4 percent in 2009, then again to 2.2 percent in 2010, and again to 1.6 percent in 2011. *Id*.

93.     Steller sea lions have been adversely impacted by the Section 120 activities authorized by NMFS. In May 2008, two Steller sea lions hauled out on floating platform traps died after the gates had been closed preventing their exit. Initial reports suggested that the sea lions had been shot, but NMFS later concluded that the sea lions died of heat stroke. NMFS, ESA Section 7 Consultation No. 2008/08780 at 4 (Feb. 20, 2009) ("2009 BiOp"). Further, Section 120 activities directed toward California sea lions harass, and disrupt the normal resting and foraging behavior of, Steller sea lions. NMFS's Biological Opinions acknowledge that the Section 120 authorization will result in the non-lethal take of Steller sea lions, and explicitly acknowledge that Steller sea lions may be accidentally killed or injured. 2009 BiOp at 5; NMFS, Supplemental ESA Section 7 Consultation No. 2011/05874 at 4 (Feb. 29, 2012) ("2012 Supplemental BiOp").

**D.     Section 120 and the Ballard Locks Situation**

94.     Congress enacted Section 120 of the MMPA primarily in reaction to a particular instance of pinniped predation of steelhead occurring at Ballard Locks in Seattle, Washington. *See* 140 Cong. Rec. S3288-01, S3299 (1994) (statement of Senator Kerry explaining Section 120 was added to "address a decade-long problem in Washington State" and describing the Ballard

Locks situation in detail); S. Rep. 103-220 (1994) (Section 120 "was developed in response to predation by nuisance pinnipeds of fish runs at Ballard Locks and Columbia River in Washington State").

95.     The Ballard Locks control the water level in the Lake Washington shipping canal. In 1993-1994, the season prior to the MMPA's enactment, the winter-run steelhead run at Ballard Locks had diminished from its historic run of 2500 fish per year to only 70 fish. *See* Environmental Assessment on Protecting Wild-Run Steelhead from Predation by California Sea Lions in the Lake Washington Ship Canal, January 1995 ("Ballard EA") at 4. Marking the lowest run on record, NMFS had instituted a variety of measures, including first limiting and then completely closing both sport and tribal fisheries, improving fish passage, and altering flow to improve the abundance of steelhead populations.

96.     In previous seasons, sea lions had consumed between 42 and 65 percent of the steelhead run, and NMFS determined that "sea lion predation, *by itself*, ha[d] been documented to have prevented achievement" of steelhead spawning conservation measures. Ballard EA 3-4 (emphasis added). Thus, the situation at Ballard Locks was vastly different than the situation at Bonneville Dam.

97.     After Congress responded to this situation by enacting Section 120, the agency applied the new Section to address the situation at Ballard Locks. NMFS ultimately proposed a limited lethal take of sea lions through capture and euthanasia. Ballard EA, 89. However, NMFS stipulated that lethal removal *could not commence* until "the sea lion predation rate exceed[ed] *10 percent* of the steelhead passing on any consecutive 7-day period." *Id*. Then, after lethal removal was initiated, if the predation rate fell below 10 percent for any consecutive 14-day period, lethal removal had to cease. *Id*. NMFS estimated only 15 sea lions would be taken, and

32

required that, if at any point, 15 were lethally removed, the task force had to re-convene and evaluate the situation. Ballard EA 91.

98.     Prior to the current action at Bonneville Dam, the Ballard Locks situation was the only other time NMFS issued a Section 120 authorization.

**E.     NMFS's March 2008 Decision to Authorize to Killing Sea Lions at Bonneville Dam**

99.     In December 2006, the states of Oregon, Washington, and Idaho filed a formal application requesting authorization to kill sea lions individually identifiable sea lions seen eating salmon at Bonneville Dam. *See* 72 Fed. Reg. 4239 (Jan. 30, 2007). Pursuant to Section 120, NMFS determined that the States' application contained sufficient information to warrant convening a Pinniped-Fishery Task Force ("the Task Force") to consider the application. *Id.* at 4239. NMFS then solicited comments on the states' application and convened the Pinniped-Fishery Interaction Task Force. Although the 18-member Task Force was unable to reach consensus on the application, it nevertheless issued a "majority" opinion recommending approval of the States' application, with one dissenter. *See* 76 Fed. Reg. at 56,168–69

100.     On March 11, 2008 NMFS issued a Biological Opinion (BiOp) on the effects of the Section 120 authorization and the nonlethal deterrence activities at Bonneville Dam on nine species of ESA-listed salmonids and Steller sea lions. In the BiOp, NMFS concluded that the activities would not jeopardize the listed species or result in the adverse modification of critical habitat. NMFS, ESA Section 7 Consultation No. 2008/00486 at 2 (March 11, 2008).

101.     On March 18, 2008, NMFS issued its Final EA, a Finding of No Significant Impact ("FONSI") under NEPA, and identical Letters of Authorization to Oregon, Washington, and Idaho, granting the states authority to lethally take California sea lions under Section 120 pursuant to which the states could remove up to 85 sea lions *each year*, which was equivalent to

one percent of the Potential Biological Removal level ("PBR") for California sea lions at that time. Final EA P-1. NMFS's 2008 Letters of Authorization authorized the states to either trap and euthanize individually identifiable sea lions (if no pre-approved research, zoo, or aquarium facility was willing to accept an animal within 48 hours of its capture) or to shoot the animals while they are in the water or hauled out on certain areas. Final EA 4-7.

102.    In setting the criteria for determining whether sea lions are having a "significant negative impact on the decline or recovery" of listed salmonids, 16 U.S.C. § 1389(b)(1), NMFS expressly rejected the recommendations of the Marine Mammal Commission ("MMC"), an entity established by the MMPA to advise NMFS on scientific matters, to adopt a quantitative standard. *See* MMC, Letter to Mr. Lohn, Regional Administrator of NMFS (Nov. 23, 2007). Instead, NMFS adopted the Task Force's vague "criteria," as well as an ill-defined "totality of circumstances" approach. Final EA 2-4. The decision allowed a California sea lion to be killed if the sea lion: has been observed taking a *single* salmon in six mile area between navigation marker 85 and the Bonneville dam between January 1 and May 31 of any year, had been observed any five non-consecutive days in the same area during that same time, and was observed in the same area after being subjected to nonlethal deterrence. Final EA at 2-6.

103.    Shortly after NMFS issued its March 2008 authorization to kill sea lions at the Bonneville Dam in 2008, Plaintiffs filed a lawsuit challenging NMFS's authorization. The District Court ruled in favor of NMFS, but in November 2010, the Court of Appeals for the Ninth Circuit reversed and ruled in favor of the plaintiffs.

104.    The Court of Appeals opinion highlighted two primary errors with NMFS's 2008 decision: (1) the agency failed to adequately explain its inconsistent factual findings that sea lion predation is having a significant negative impact on salmonid recovery, and that much greater

takes by fisheries and hydropower operations are not significant; and (2) the agency failed to adequately explain its implicit determination that sea lion predation greater than 1 percent of the total run results in a significant negative impact on salmonid recovery, which must be assumed from NMFS's choice to terminate lethal removal of sea lions if the 3-year predation rate average drops below 1 percent. *See* 76 Fed. Reg. at 56,168; Decision Memo at 11.

105.    The Court of Appeals remanded to the District Court with instructions to vacate NMFS's Section 120 authorization, and to remand the matter to the agency. *Id*.

**F.    NMFS's May 2011 Decision to Authorize Killing Sea Lions at Bonneville Dam**

106.    On May 12, 2011, NMFS approved requests from the States of Washington and Oregon under Section 120 of the MMPA, authorizing the states to kill up to 85 California sea lions annually at the Bonneville Dam and indicated that the authorization to kill sea lions would be effective immediately. NMFS granted this authorization without any prior public notice, without seeking public comment on the states' new request, and without convening the Pinniped-Fishery Interaction Task Force, as required by Section 120 of the MMPA.

107.    In addition to dispensing with the procedural requirements of the statute, NMFS's decision failed to articulate a rational explanation for reconciling its disparity in *factual* findings that salmon take far in excess of 4 percent by fishermen, tribes, and other resources users does *not* have a "significant" impact on the species as required by the Ninth Circuit. Moreover, NMFS also failed to adequately explain its decision to require a "detectable decline" in actual salmon caught by sea lions before terminating the lethal removal program instead of the previous threshold of a 1 percent predation rate.

108.    Accordingly, Plaintiffs challenged the decision on May 20, 2011, alleging both procedural and substantive violations of the MMPA. NMFS revoked the authorization on July 25, 2011 citing the litigation.

**NMFS's March 2012 Decision to Authorize Killing Sea Lions at Bonneville Dam**

109.    Following NMFS's July 2011 revocation of the lethal removal authorization, the States of Oregon, Washington, and Idaho quickly submitted a new application to NMFS on August 18, 2011 in which they request lethal removal authority "identical to the authority NMFS issued to the States" in May of 2011. 76 Fed. Reg. 56,167 (Sept. 12, 2011).

110.    NMFS determined that the States' application contained sufficient information to warrant seeking public comment and to convene the Pinniped-Fishery Task Force ("the Task Force") to consider the application. *Id.*

111.    On October 12, 2011, HSUS submitted extensive comments on the application.

112.    The MMC also submitted comments on the application. In its comments, the MMC reiterated its belief that NMFS should adopt a quantitative standard "that relates specific consumption rates (or numbers) to population level impacts on the affected fish stocks" for determining whether California sea lions are having a significant negative impact on listed salmonids and expressed its "lingering concerns" as to whether Section 120 is the appropriate vehicle with which to address sea lion predation at Bonneville Dam. MMC, Letter to Ms. Darm, Assistant Regional Administrator of NMFS (Oct. 18, 2011).

113.    NMFS convened the Task Force, which met by teleconference on October 24, 2011 and on November 15, 2011 once again a majority recommended approval of the States' application, this time with two members dissenting. The dissenters both expressed their concerns that Section 120 was not the appropriate vehicle with which to address sea lion predation at

Bonneville Dam because the data indicate that new animals will merely replace those that the states remove, and that factors other than sea lion predation have much greater impacts on salmon recovery. *See* NMFS' Pinniped-Fishery Interaction Task Force, Oct. 24, 2011 Task Force Meeting, Facilitator's Report (Nov. 15, 2011).

114.    On March 15, 2012 NMFS issued lethal removal authorization, despite the existence of reasonable, nonlethal alternatives that the states have not taken or explored. Pursuant to the authorization, which is effective on March 20, 2012, the states can lethally remove up to 92 individually identifiable California sea lions wherever found (except for breeding rookeries) every year for five years—a total of 460 animals.

115.    NMFS's 2012 Letters of Authorization authorize the states to either trap and euthanize sea lions or to shoot the animals while they are in the water or hauled out on certain areas. NMFS, Letter of Authorization to Idaho Department of Fish and Game (May 15, 2012) ("LOA") at 2–3. The terms of the authorization largely mirror those of the 2008 authorization, with the exception that the area in which sea lions seen taking salmonids may be added to the list of animals targeted for removal (i.e., the California sea lions deemed "individually identifiable pinnipeds") has been expanded to include the fish ladders and areas above the Dam, and NMFS no longer requires the states to hold California sea lions captured in traps for 48 hours prior to euthanizing them—the states can immediately euthanize an individually identifiable California sea lion captured in a trap. *Id.* LOA at 2. NMFS also eliminated the 1 percent predation rate threshold for suspension of lethal removal activities

116.    NMFS once again has made no attempt to answer the critical question of what level of take of salmon actually constitutes a "significant negative impact on the decline or recovery of [listed] salmonid fishery stocks" or what level of take would be "insignificant" and

relies instead on a vague list of factors including, *inter alia,* that predation is "measurable" and "growing"; the number of sea lion at the dam is unpredictable and can easily grow; that predation could continue to increase if not addressed; and that salmonid mortality is "comparable to mortality rates from other soures" currently being managed. Decision Memo at 13–17.

117.    NMFS's Decision Memorandum seeks to explain the inconsistency in its factual findings that sea lion predation is having a significant negative impact on salmonid recovery, and that much greater takes by fisheries and hydropower operations are not significant, by asserting that pinniped predation occurs disproportionately on early and late arriving fish and has a "depensatory effect" on salmon, increasing the risk of something called an "extinction vortex" if run sizes are low. Decision Memo at 31 (citing only a personal communication for support of these two notions). NMFS also seeks to explain away its disparate factual findings by claiming that pinniped predation is a new, unmanageable and increasing threat to salmonids, and fisheries and hydropower dams are a controlled and decreasing threat. *Id.* However, as indicated above, the data paint a very different picture than NMFS attempts to portray.

118.    NMFS's Decision Memorandum also seeks to respond to the problems identified with its 1 percent predation rate threshold for suspension of lethal removal activities by simply abandoning the threshold altogether. The states can now kill up to 92 sea lions per year for five years, no matter their level of impact and even if sea lion predation was to cease.

119.    With its authorization, NMFS also issued a Supplemental Biological Opinion analyzing the impacts of the California sea lion removal program in the Columbia River from 2012 through 2016 on ESA-listed species and their critical habitat. In the opinion, NMFS acknowledges that the action will harass threatened Steller sea lions via disruption of foraging and resting behavior and explicitly acknowledge that Steller sea lions may be accidentally killed

or injured. 2012 Supplemental BiOp at 4. Despite finding that the action will take Steller sea

lions, NMFS has not authorized such take pursuant to the MMPA. 16 U.S.C. § 1371(a)(5)(A), or

the ESA, 16 U.S.C. 1536(b)(4); 50 C.F.R. § 402.14(i).

120.    NMFS also issued a Supplemental Information Report ("SIR") on its 2008 Final

EA concerning the impacts of the sea lion killing authorization, in which NMFS states it was not

re-opening the Final EA. However, NMFS proceeded to describe new data and other information

not previously considered in the 2008 Final EA or during the prior authorization process. As to

all of this data, NMFS concluded that "that the new circumstances and/or information. . . are not

significant" and that "additional public review. . .  is not warranted or practicable." SIR 38 –39.

NMFS made its decision to part with public participation, not for any valid legal or factual

reason, but because the agency "faced a significant constraint to issue a new decision" so that

lethal removals could be authorized this season. SIR at 37.

121.    In particular, NMFS briefly noted one category of new data which the agency

claimed was irrelevant to its Section 120 authorization. NMFS recognized that new studies on

the effects of predation by non-indigenous fish on juvenile salmonids had found that the effects

"could equal or exceed impacts" from each of the four primary factors impacting salmonid

recovery: hydrosystem development, fisheries harvest, hatchery practices, and habitat alteration.

SIR at 22. These four other sources of impacts on salmonid recovery were discussed in NMFS's

2008 Final EA. Final EA at P-3, 3-15–3-33. Nevertheless, NMFS declined to review the

potential environmental impacts of predation by non-indigenous fish on salmon recovery after

concluding that this issue "does not have a bearing on the environmental impacts associated with

the proposed action." SIR at 23.

### PLAINTIFFS' CLAIMS FOR RELIEF

Claim 1: Violations of Section 120 of the MMPA and the APA

122.     Plaintiffs incorporate herein by reference all of the allegations contained in paragraphs 1–121 above.

123.     In authorizing the killing of up to 92 sea lions per year, NMFS has violated MMPA and APA. Specifically, NMFS: (1) adopted an impermissible interpretation of the statutory "significance" standard, in part by relying on factors that merely attempt to re-write the statutory standard to fit the agency's desired outcome; (2) failed to adequately explain its prior inconsistent factual findings that sea lion predation is having a "significant negative impact on the decline or recovery" of listed salmonids, and that much greater takes by fisheries and hydropower operations are not significant; (3) arbitrarily and capriciously eliminated the 1 percent predation rate threshold, which if met, would have required termination of the lethal removal program; (4) failed to adequately consider whether the States had demonstrated "that no feasible and prudent alternatives exist and that the applicant has taken all reasonable nonlethal steps without success"; and (5) ignored and/or misinterpreted important data regarding other sources of salmonid mortality (including ignoring the effects of non-indigenous fish predation on the recovery of listed salmonids, conflating predation of California sea lions with that of Steller sea lions, and ignoring new information the detrimental impacts from hatcheries). 16 U.S.C. § 1389.

124.     NMFS's decision to authorize the lethal removal of sea lions at Bonneville Dam is thus arbitrary and capricious, an abuse of discretion, and not in accordance with the MMPA, 16 U.S.C. § 1389, and must be set aside. 5 U.S.C. § 701-706.

<u>Claim 2: Violation of Section 101 of the MMPA and the APA</u>

125.     Plaintiff incorporates herein by reference all of the allegations contained in paragraphs 1–124 above

126.     The MMPA prohibits the unauthorized take of marine mammals. 16 U.S.C. §§ 1371(a); 1372(a). Section 101(a)(5) contains a limited exception to this broad prohibition pursuant to which NMFS can authorize the incidental take of "small numbers" of marine mammals by those engaged in "a specified activity . . . within a specified geographical area" provided NMFS finds that such take will have a "negligible impact" on the species or stock to be taken. 16 U.S.C. § 1371(a)(5).

127.     In its decision documents, NMFS acknowledges that Steller sea lions will be non-lethally taken during both the removal activities at the Dam via disruption of resting and foraging grounds and acknowledged the potential for Stellers to be accidentally shot or killed. NMFS however, failed to authorize the take of Stellers under the MMPA.

128.     NMFS's decision to authorize the lethal removal of sea lions at Bonneville Dam without first authorizing the take of Steller sea lions that will occur during the Section 120 activities directed at California sea lions is arbitrary and capricious, an abuse of discretion, and not in accordance with the MMPA, 16 U.S.C. § 1371(a)(5), and must be set aside.  5 U.S.C. § 701-706.

<u>Claim 3: Violations of the ESA and APA</u>

129.     Plaintiff incorporates herein by reference all of the allegations contained in paragraphs 1–128 above.

130.     The ESA and its implementing regulations prohibit the take of a Steller sea lion. 16 U.S.C. § 1538(a)(1)(G); 50 C.F.R. § 223.202(a). When a biological opinion finds that an

action will not jeopardize the affected species, but nevertheless will result in the incidental take

of such species, the ESA requires the preparation of an incidental take statement. 16 U.S.C. §

1536(b)(4)(C); 50 C.F.R. § 402.14(g)(7), (i). Such statement is required when incidental take

"*may* occur" as a result of the action. 50 C.F.R. § 402.14(g)(7) (emphasis added).

131.    In its Biological Opinions, NMFS acknowledges that the action will result in the

take of Steller sea lions via disruption of foraging and resting behavior. 2009 Biop at 38–39.

2012 Supplemental BiOp. NMFS, however failed to authorize the incidental take of this listed

species, claiming that the anticipated take of Stellers "by government officials. . . acting in the

course of their official duties related to the *nonlethal* removal of nuisance animals is authorized

by 50 C.F.R. § 223.202(b)(2)." 2012 Supplemental BiOp at n. 6; 2009 BiOp at 41 n 1 (emphasis

added). However, the exemption to the prohibition on the take of Steller sea lions does not apply

during the *lethal* removal of California sea lions.

132.    NMFS's failure to issue an incidental take statement with its Biological Opinions

for the take of Steller sea lions that may result as a result of the Section 120 activities directed at

California sea lions is arbitrary, capricious, an abuse of discretion, and not in accordance with the

ESA or its implementing regulations, 16 U.S.C. § 1536(b)(4)(C); 50 C.F.R. § 402.14(g)(7), (i). 5

U.S.C. § 706(2)(A). The 2009 Biological Opinion and the 2012 Supplemental Biological

Opinion should be held unlawful and set aside. 5 U.S.C. § 706(2).

133.    Moreover, NMFS's decision to authorize lethal removal of California sea lions in

absence of an incidental take statement for Steller sea lions is arbitrary and capricious, an abuse

of discretion, and not in accordance with the ESA, § 1536(b)(4)(C); 50 C.F.R. § 402.14(g)(7),

(i), and must be set aside.  5 U.S.C. § 701-706.

Claim 4: Violations of NEPA and the APA

134.    Plaintiff incorporates herein by reference all of the allegations contained in paragraphs 1–133 above.

135.    By issuing an SIR instead of preparing a supplemental EA or an EIS, NMFS has violated NEPA and the APA.  Further, NMFS failed to provide prior public notice and opportunity to comment on the potential environmental impacts noted in the SIR. NMFS's decision to authorize the lethal removal of sea lions at Bonneville Dam based on the SIR is arbitrary and capricious, an abuse of discretion, and not in accordance with NEPA, 42 U.S.C. § 4332; 40 C.F.R. 1502.9(c), and must be set aside. 5 U.S.C. § 701-706.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter an order:

1.      Declaring Defendants' decision to authorize the lethal removal of sea lions at Bonneville Dam to be unlawful under the Marine Mammal Protection Act, 16 U.S.C. § 1362, *et seq*., Endangered Species Act, 16 U.S.C. § 1531, *et seq*., National Environmental Policy Act, 42 U.S.C. § 4321, *et seq*., and "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law" under the Administrative Procedure Act, 5 U.S.C. § 551, *et seq*.;

2.      Enjoining Defendants' authorization of lethal removal of sea lions at Bonneville Dam, and vacating and remanding to NMFS the decision to authorize lethal removal;

3.      Awarding Plaintiffs their reasonable attorneys' fees and costs for this action; and

4.      Granting Plaintiffs such other and further relief as may be just and proper.

Respectfully Submitted,

_____
Ralph E. Henry
D.C. Bar No. 982586
Jonathan R. Lovvorn
D.C. Bar No. 461163
The Humane Society of the United States
2100 L Street, N.W.
Washington, DC 20037

*Attorneys for Plaintiffs*